**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK LUGINO MEGLIORINO,<br><br>        Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of the<br>Social Security Administration,<br><br>        Defendant. | Case No. CV 14-6945 SS<br><br><br>**MEMORANDUM DECISION AND ORDER** |

**I.**

**INTRODUCTION**

    Mark Lugino Megliorino ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying his application for Supplemental Security Income.  The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On September 14, 2005, Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI"). (Administrative Record ("AR") 43). Plaintiff alleged a disability onset date of January 1, 2003. (Id.). On December 20, 2007, Administrative Law Judge ("ALJ") Joel B. Martinez (the "First ALJ") denied Plaintiff's applications. (AR 44).

On July 31, 2008, Plaintiff filed a new SSI application (the "Second Application"), again alleging a disability onset date of January 1, 2003. (AR 75). On November 4, 2010, ALJ Philip J. Simon (the "Second ALJ") denied the Second Application. (AR 76). The Second ALJ found that Plaintiff had rebutted the presumption of continuing nondisability following the First ALJ's decision, based on a material change in medical circumstances. (AR 76, 80). However, the Second ALJ found that Plaintiff was not disabled and was able to perform his past relevant work as a cashier despite his newly alleged impairments.[1]  (AR 85-86). \\

---

[1] Of relevance here, the Second ALJ identified five severe impairments: status-post gunshot wounds with residual fragments remaining within the body; status-post arthroscopic surgery on the right knee; disc protrusions of the lumbosacral spine; polysubstance abuse; and bipolar disorder. (AR 79). The Second ALJ also noted medical evidence of elevated lead levels in Plaintiff's blood, apparently associated with the residual gunshot fragments. (AR 80). However, there was no evidence of a medical or psychiatric impairment related to lead. (Id.).

1   On July 10, 2012, this Court affirmed the Second ALJ's decision.
2   See Megliorino v. Astrue, Case No. 11-7895 (SS), Dkt. No. 18.

4       Plaintiff filed his most recent application for SSI benefits
5   on May 17, 2011.  (AR 177).  Plaintiff alleged a disability onset
6   date of November 5, 2010.  (Id.).  The Agency denied Plaintiff's
7   application on November 21, 2011 (AR 132-36), and upon
8   reconsideration on June 27, 2012.  (AR 138-43).  On July 13,
9   2012, Plaintiff requested a hearing before an ALJ.  (AR 145).
10  Plaintiff testified before ALJ Jan Donsbach (the "Third ALJ") on
11  December 6, 2012 (the "ALJ Hearing").  (AR 25-39).  On March 20,
12  2013, the Third ALJ issued a decision denying disability
13  benefits.  (AR 6-14).  The Third ALJ concluded that Plaintiff had
14  failed to rebut the presumption of continuing nondisability
15  following the Second ALJ's decision.  (AR 12).  Plaintiff filed a
16  request for review of the Third ALJ's unfavorable decision on
17  April 26, 2013 (AR 5), which the Appeals Council denied on August
18  7, 2014.  (AR 1-3).  The Third ALJ's decision thus became the
19  final decision of the Commmissioner.  (AR 1).  Plaintiff filed
20  the instant action on September 19, 2014.

22                              **III.**
23                      **FACTUAL BACKGROUND**

25      Plaintiff was born on September 9, 1966.  (AR 177).  He was
26  forty-four years old as of the alleged disability onset date and
27  forty-six years old at the time of his hearing before the Third
28  ALJ.  (Id.).  Plaintiff completed the tenth grade but did not

                                   3

graduate from high school. (AR 215). Plaintiff previously worked as a water cooler repairman, warehouse employee, cashier and maintenance worker. (AR 240-45). However, Plaintiff has been unemployed since June 1999. (AR 28-29, 240). In the Disability Report accompanying Plaintiff's SSI application, Plaintiff listed his illnesses as "Bi-Polar," depression, arthritis and "forgetful." (AR 214).

**A.   Medical History And Treating Doctors' Opinions**

    **1.   Northeast Mental Health Center**

    Plaintiff first sought mental health treatment at Northeast Mental Health Center, a public facility, on June 18, 2008. (AR 238). Raymond Yee, M.D., a staff psychiatrist, described Plaintiff's condition as "symptoms of depression including passive suicidal ideation." (AR 482). In an annual assessment completed on June 30, 2009, supervising psychologist Alvaro Campos noted that Plaintiff "at times relapses on heroine [sic]."[2] (AR 480). Plaintiff was prescribed Seroquel, Cymbalta, Remeron and Inderal.[3] (AR 478). On April 4, 2010, after Plaintiff reported hearing voices, Dr. Yee added a prescription

---

[2]  Plaintiff's treatment record includes an August 6, 2007, hospital admission due to a heroin overdose. (AR 443-46).

[3] According to the National Institutes of Health, Seroquel may be prescribed for schizophrenia, mania or depression. Cymbalta is used to treat depression and generalized anxiety. Remeron is an antidepressant. Inderal is prescribed for hypertension. See MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ druginformation.html, and search by drug name (last visited June 12, 2015).

for Fanapt.[4]    (AR 477).    On May 14, 2010, Plaintiff expressed
concern about an upcoming hearing regarding his latest SSI
application.   (AR 476).    However, Dr. Yee described Plaintiff's
treatment response as "good," noted no suicidal or homicidal
ideation or mood swings, and assessed Plaintiff as "stable" and
"nonpsychotic."   (Id.).   On July 30, 2010, Plaintiff complained
that "they keep changing my lawyers -- they say I'm a bipolar"
and again expressed concern about his SSI application.   (AR 473).
However, his treatment response remained "good" and his condition
"stable" and "nonpsychotic."   (Id.).   On September 16, 2010, five
days before the Second ALJ Hearing, Dr. Yee co-signed a letter
informing ALJ Simon that Plaintiff was "diagnosed
Bipolar/Schizoaffective and suffers from severe depression."   (AR
486).

        On October 15, 2010, approximately three weeks before his
alleged disability onset date, Plaintiff told Dr. Yee that he had
made a court appearance,[5] where he was told that he had relapsed
on heroin and "has firearms."   (AR 492).    However, Dr. Yee
continued to note a "good" treatment response and stable
condition, with no mood swings.   (Id.).   On November 16, 2010,
Plaintiff's first visit following his alleged disability onset
date and following the Second ALJ's decision, Plaintiff described
"another damn denial" and reported hearing voices and seeing

---

[4]  Fanapt is an atypical antipsychotic.   See MEDLINEPLUS,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609026.html
(last visited June 16, 2015).
[5]  The administrative record does not specify the nature of this
appearance.

shadows.  (AR 491).  Although he told Dr. Yee "I'm not getting any better," Dr. Yee again noted good treatment response, no mood swings, and stable condition.  (Id.).  On December 16, 2010, Plaintiff complained that the Second ALJ denied SSI "because the judge said that I didn't have schizophrenia-bipolar diagnosis in my chart."  (AR 490).  Dr. Yee noted that Plaintiff "want[ed] it written down in his chart in order to get his SSI approved." (Id.).  Dr. Yee did not add any notation to Plaintiff's records regarding these disorders, and again found Plaintiff "stable." (Id.).  However, on December 23, 2010, Dr. Yee and a social worker signed a letter stating that Plaintiff "has been given a diagnosis of Bipolar/Schizoaffective disorder and suffers from severe depression."  (AR 237).

On January 12, 2011, approximately six weeks before Plaintiff filed his most recent SSI application, Dr. Yee noted that Plaintiff "feels better today and talked happily about his dog."  (AR 489).  Dr. Yee also noted that due to an "old warrant," Plaintiff reported that he had to perform community service.  (Id.).  Plaintiff continued to take his medications and his condition remained stable.  (Id.).  On September 2, 2011, Plaintiff again expressed concern about "not getting SSI."  (AR 554).  Although Dr. Yee noted that Plaintiff was "angry-upset," he again found that Plaintiff had no mood swings.  (Id.).  On March 6, 2012, Plaintiff complained that he was "hearing whispers," but Dr. Yee again found him nonpsychotic.  (AR 551).

\\
\\

On June 15, 2012, Plaintiff reported "I'm okay now," after talking with a therapist and gaining a "better understanding." (AR 549).  On November 30, 2012, six days before the most recent ALJ Hearing, Plaintiff described himself as "despondent" and told Dr. Yee that "people had saved him from jumping a bridge."  (AR 545).   However, Dr. Yee again found that Plaintiff did not display any suicidal or homicidal ideation, was nonpsychotic, and did not have mood swings.  (Id.).   Plaintiff's condition was stable, his treatment response "good," and he continued to take his medications.  (Id.).   Finally, on December 6, 2012, Drs. Yee and Campos sent Plaintiff's counsel a letter in which they described Plaintiff as "continuing to struggle with symptoms of depressed mood, irritability, increasing agitation and difficulty around other people."  (AR 605).

**B.   Examining Physicians' Opinions**

     **1.   David Bedrin, M.D.**

On April 28, 2009, Dr. David Bedrin conducted a psychiatric examination of Plaintiff.  (AR 280-86).   Dr. Bedrin noted that Plaintiff supplied the information cited in his evaluation.  (AR 280).   Plaintiff said that he had felt fatigued since 1992 or 1993 (AR 281) and felt depressed all the time, but stated that his mood on the day of the examination was "fair."  (AR 280). Plaintiff claimed to see shadows and hear voices, but was not experiencing these symptoms at the time of the examination.  (AR 284).   Plaintiff sometimes experienced "manic type symptoms," but

said this was "very rare" and he could not remember the last such occurrence. (AR 281). Plaintiff denied any hospitalizations for mental illness. (AR 281). However, Plaintiff described a history of daily heroin use beginning when he was thirty-one years old and continuing until "around 2006." (AR 283). He also drank alcohol heavily until 2005. (Id.).

Dr. Bedrin found Plaintiff pleasant, relaxed, and in "no acute distress," with no bizarre posturing or mannerisms. (AR 284). Plaintiff took care of his own grooming and hygiene and was able to drive. (AR 285). Although Plaintiff's recent memory was "mildly impaired" and his intellect below average, his insight and judgment were "good." (AR 284-85). Dr. Bedrin concluded that Plaintiff might be impaired in his ability to complete complex tasks, but could perform simple tasks. (AR 286). Plaintiff could perform work activities consistently and without special supervision or interruptions. (Id.). Dr. Bedrin also concluded that Plaintiff could interact with coworkers and the public. (Id.).

### 2.   Soheila Benrazavi, M.D.

Dr. Soheila Benrazavi conducted a physical examination of Plaintiff on September 9, 2011. (AR 495-501). Plaintiff reported that a shotgun wound left residual lead shrapnel in his knees and surrounding tissues. (AR 496). Although Plaintiff had leg and knee stiffness and walked with a cane, he was in no acute distress. (Id.). Dr. Benrazavi opined that Plaintiff did not

need to use an assistive device to walk. (AR 499). She concluded that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, and could sit, stand and walk for six hours of an eight-hour day. (AR 500). Plaintiff was limited to occasional stooping, kneeling, crawling, crouching, squatting or climbing but had no "manipulative, visual, communicative or workplace environment limitations." (Id.).

C.  **Non-Examining Psychologist's Opinion Regarding Plaintiff's Mental Condition**

Consulting psychologist Carol Mohney, Ph.D., reviewed Plaintiff's treatment records on November 21, 2011. (AR 516-27). Dr. Mohney assessed Plaintiff for affective disorders under listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1, including major depressive disorder ("MDD") and post-traumatic stress disorder ("PTSD").[6]  (AR 516, 519). In reviewing the "Paragraph B" criteria of this listing, Dr. Mohney found that Plaintiff had mild limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (AR 524). However, Plaintiff did not exhibit repeated, lengthy episodes of decompensation, and the evidence did not establish the presence of any "Paragraph C" criteria.[7]  (AR 524-25). Although Dr. Mohney noted Plaintiff's

---

[6] Listing 12.04 includes the criteria for "affective disorders," including depression, hallucinations, and bipolar syndrome. Id.
[7] To meet the criteria of Listing 12.04, Paragraph C, a patient must show a "[m]edically documented history of a chronic

9

allegation that he "has significant difficulty with every aspect of his ability to function," she concluded that Plaintiff's condition was stable, that he had no psychosis or mood swings, and that Plaintiff was compliant with and responded well to his medications. (AR 526). Dr. Mohney concluded that there was new and material evidence since the Second ALJ's decision, but did not conclude that Plaintiff's impairments were severe. (Id.).

**D.   Non-Examining  Physician's  Opinion  Regarding  Plaintiff's Physical Condition**

Consulting physician Nancy Armstrong, M.D., reviewed Plaintiff's treatment records on November 21, 2011. (AR 509-15). Dr. Armstrong incorporated Dr. Benrazavi's residual functional capacity findings in her assessment. (AR 510-14). She opined that Plaintiff's alleged functional limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking and hearing were inconsistent with the medical evidence of record. (AR 514). She concluded that Plaintiff's \\

---

affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

1    treatment   records   were   consistent   with   Dr.   Benrazavi's

2    conclusions.   (<u>Id.</u>).

3

4    **E.    <u>Vocational Expert Testimony</u>**

5

6        Vocational Expert ("VE") Susan Green testified at the ALJ

7    Hearing regarding the existence of jobs that Plaintiff could

8    perform given his functional limitations.   (AR 37-38).   The VE

9    identified Plaintiff's past work as a "cashier II," with a

10   Dictionary of Occupational Titles ("DOT") listing of 211.462-010.

11   (AR 38).   The VE opined that this occupation constitutes "light"

12   work.   (<u>Id.</u>).

13

14       The Third ALJ posed three hypotheticals to the vocational

15   expert.   First, the ALJ described an individual with a "medium"

16   RFC.   (<u>Id.</u>).   The VE opined that such a person would be able to

17   perform Plaintiff's past work.   (<u>Id.</u>).   The ALJ then asked the VE

18   whether such an individual could perform work as a cashier II if

19   he were limited to "simple work."   (<u>Id.</u>).   The VE concluded that

20   the individual could not perform Plaintiff's past relevant work

21   as a cashier.   (<u>Id.</u>).   However, such an individual could find

22   work as an industrial cleaner, with one million jobs nationally

23   and 39,000 locally, or as a hand packager, with 160,000 jobs

24   nationally and 10,000 locally.   (<u>Id.</u>).   Finally, the ALJ asked

25   the VE whether the same individual could find work if he had

26   problems maintaining concentration and staying on-task for two

27   hours at a time.   (<u>Id.</u>).   The VE found that such a person could

28   not find employment of any sort.   (<u>Id.</u>).

**F.   <u>Plaintiff's Testimony</u>**

    **1.   Testimony Before The Third ALJ**

At the ALJ Hearing, Plaintiff testified that he left his previous job as a cashier after being suspended for repeated tardiness. (AR 29). Plaintiff attributed his difficulties to irritability and an inability to be around others. (<u>Id.</u>). Plaintiff testified that he also had difficulty concentrating and staying on his feet "for a long time." (<u>Id.</u>).

Plaintiff saw his psychiatrist every four to six weeks and a social worker every two weeks. (AR 29-30). Plaintiff stated that his psychiatrist "actually hears me out," but also that she did not always listen when he described how badly he felt. (AR 37). Plaintiff took medications for schizophrenia and insomnia but experienced nausea from one or both drugs. (AR 30). As a result of his shotgun wounds, Plaintiff had pain and stiffness in his knees as well as "causal arthritis" throughout his body. (AR 31). Plaintiff took Motrin to manage his knee pain but stated that he would have to "ride out" the pain until he could see a doctor and "see what the heck is going on in there." (AR 32). Despite his medications, Plaintiff was "starting to get more angry, really forgetful." (AR 34).

Plaintiff rented a room at the home of friends. (AR 33). During the day, he lay down "a lot," but also became restless because "[m]y mind races so much." (AR 34). Plaintiff did not

help out around the house because his friends took care of chores, including Plaintiff's laundry. (Id.).

**2.     Statements From Plaintiff's Benefits Application**

On June 6, 2011, Plaintiff completed a function report in connection with his SSI application. (AR 229-36). Plaintiff described having "restless nites [sic]" because his mind was "constantly racing." (AR 229). Periodically, he could sleep for only one or two hours over two days. (Id.). Plaintiff heard voices and shotgun blasts in his head. (Id.).

Plaintiff could bathe and dress himself, but had some difficulties due to arthritis pain in his hands and knees. (AR 230). Plaintiff was forgetful and attributed this condition to residual gunshot lead in his bloodstream. (AR 231, 233, 234). He had to be reminded to change clothes or bathe. (AR 231). However, Plaintiff prepared his meals daily, sometimes with his friends' assistance. (Id.). Plaintiff did not do house or yard work because he was "always fatigued." (AR 232). However, he shopped for groceries twice a week for one-half hour to two hours, or more quickly if he had help. (Id.).

Plaintiff went outside when he shopped or visited doctors. (Id.). He could walk "real slow," ride in a car and use public transportation. (Id.). Plaintiff did not have hobbies or outside interests and did not participate in social activities other than short walks. (AR 233-34). Plaintiff could walk about

half a block before having to rest for ten to fifteen minutes due to "something wrong w/ spine." (AR 234). Plaintiff attended church, "but my condition has worsen [sic] and I don't want to be around people." (AR 233).

Plaintiff judged himself "very incapable" of following written or spoken instructions due to his memory problems and medications. (AR 234). He could pay attention for a few minutes, but would then doze off. (Id.). He tried his best to get along with authority figures, but was fearful. (AR 235). He noted that he had documents showing that he had bipolar and schizoaffective disorder and depression. (AR 236).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, "a claimant must show that a medically determinable physical or mental impairment prevents her from engaging in substantial gainful activity and that the impairment is expected to result in death or to last for a continuous period of at least twelve months." Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant "incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To determine whether a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps and their related inquiries are as follows:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

(5) Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

\\
\\
\\

15

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1099, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The Commissioner may do so by eliciting testimony from a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

### THE THIRD ALJ'S DECISION

The Third ALJ concluded that Plaintiff had not rebutted the presumption of continuing nondisability established by the Second

ALJ's decision.[8]   (AR 11).   The Third ALJ found that the record showed neither a new impairment nor a worsening of Plaintiff's existing impairments.   (AR 12).   He noted that Plaintiff turned forty-five years old after the Second ALJ's decision.   (Id.).   However, because the Second ALJ did not consider age as a factor when he found that Plaintiff was capable of performing his past relevant work, the Third ALJ concluded that Plaintiff's increased age did not constitute a changed circumstance.[9]   (Id.).

    The Third ALJ then employed the five-step sequential evaluation process and concluded that Plaintiff had not been disabled within the meaning of the Social Security Act since February 28, 2011, when he filed his SSI application.   (AR 9). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since February 28, 2011.   (AR 12). At step two, the ALJ found that Plaintiff had the severe

---

[8]   The heading introducing this section of the Third ALJ's decision contains a typographic error stating that "[Plaintiff] has not rebutted the presumption of continuing <u>disability</u> established by the Administrative Law Judge (ALJ) decision of November 4, 2010 (AR 97-4(9))."   (AR 11) (emphasis added). However, the Second ALJ found Plaintiff not to be disabled.   (AR 85).

[9]   Plaintiff does not contend that Plaintiff's age constitutes a "changed circumstance."   The Court notes, however, that an individual qualifies as a "[y]ounger person" under Social Security vocational factors if he is below age fifty. 20 C.F.R. § 404.1563(c).   However, "in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45."   <u>Id.</u> Specifically, a forty-five year old individual who is limited to sedentary work, is illiterate or unable to communicate in English, and has either no prior work experience or only unskilled work experience may be considered disabled, where a forty-four year old would not be.   20 C.F.R. Pt. 404, Subpt. P, App. 2.

impairment of arthritis due to gunshot wounds. (Id.). The Third ALJ specifically opined that although the Second ALJ found that Plaintiff had "severe" mental impairments, Plaintiff's medical records since his latest alleged onset date did not demonstrate such impairments. (Id.). Therefore, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (Id.).[10]

The Third ALJ then found that Plaintiff had a residual functional capacity to perform a full range of medium work as defined in 20 C.F.R. § 416.967(c).[11] (AR 14). In reaching this finding, the ALJ stated that he had considered all sections of the Listing of Impairments, particularly those pertaining to musculoskeletal impairments. (AR 13).

At step four, the Third ALJ determined that Plaintiff was capable of performing his past relevant work as a cashier II. (AR 14). The ALJ noted the vocational expert's conclusion that this job is unskilled, performed at the "light" exertional level, and has mental and physical requirements compatible with Plaintiff's RFC. (Id.). Therefore, the Third ALJ found that

---

[10] A physical or mental impairment is considered "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520.

[11] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

Plaintiff was not under a disability as defined by 20 C.F.R. § 404.920(f).  (Id.).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).  However, the court must "affirm the denial of disability benefits if it is supported by substantial evidence and the Commissioner applied the correct legal standards."  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

1  Cir. 1993)).    If  the  evidence  can  reasonably  support  either

2  affirming  or  reversing  that  conclusion,  the  court  may  not

3  substitute  its  judgment  for  that  of  the  Commissioner.  Reddick,

4  157 F.3d at 720-21.

5

6                              **VII.**

7                            **DISCUSSION**

8

9       Plaintiff  challenges  the  Third  ALJ's  decision  on  three

10  grounds.   First,  Plaintiff  asserts  that  the  Third  ALJ  improperly

11  found  that  Plaintiff  failed  to  rebut  the  presumption  of

12  continuing   nondisability   established   by   the   Second   ALJ's

13  decision.    (Memorandum  in  Support  of  Plaintiff's  Complaint

14  ("MSC"),  Dkt.  No.  15,  at  5).   Plaintiff  contends  that  the  Third

15  ALJ  failed  to  consider  an  increase  in  the  severity  of  Plaintiff's

16  mental   impairments   as   a   "changed   circumstance"   capable   of

17  rebutting  this  presumption.    (Id.  at  7).    Second,  Plaintiff

18  asserts  that  the  Third  ALJ  erred  in  finding  that  Plaintiff's

19  mental  impairment  is  not  severe  and  in  discounting  the  opinions

20  of  Plaintiff's  treating  and  examining  physicians.   (Id.  at  8).

21  Plaintiff  contends  that  his  diagnoses  with,  inter alia,  bipolar

22  disorder,  major  depressive  disorder  and  PTSD  (id.  at  8,  10),  and

23  his  limited  ability  in  social  interaction  (id.  at  9),  show  severe

24  impairment.   (Id.  at  8).   Plaintiff  also  asserts  that  the  Third

25  ALJ  failed  to  provide  specific  and  legitimate  reasons  for

26  discounting  the  treating  and  examining  physicians'  opinions.

27  (Id.  at  12).    Finally,  Plaintiff  contends  that  the  Third  ALJ

28  \\

failed to "fully and fairly develop the record" because he did not order a new psychiatric consulting examination. (Id. at 17).

The Court disagrees with these contentions. Although Plaintiff's treating physicians sent Plaintiff's counsel a letter terming Plaintiff's mental condition "deteriorated," their treatment records do not show a "changed circumstance" capable of rebutting the presumption of continuing nondisability. Furthermore, the Third ALJ provided specific and legitimate reasons for rejecting the treating and examining physicians' opinions. Finally, although an ALJ has a duty to develop the record, this duty did not extend to requiring a new psychiatric examination in this case. Accordingly, for the reasons discussed below, the Third ALJ's decision must be AFFIRMED.

## A.   **Plaintiff Fails To Rebut The Presumption Of Continuing Nondisability**

Plaintiff asserts that the Third ALJ failed to consider an increase in the severity of his impairments as a "changed circumstance." (MSC at 7). Plaintiff bases this contention on Drs. Campos and Yee's December 6, 2012 letter, in which the doctors opined that Plaintiff's mood instability and difficulty with attention, focus and concentration had worsened over the course of his treatment. (MSC at 7; AR 605). Plaintiff also notes that his "continued" mental health treatment after the Second ALJ's decision included medication with Cymbalta, Remeron,

Seroquel, Ativan and Latuda and that he continued to hear voices and whispers and to see shadows.  (MSC at 5).

Because "principles of res judicata apply to administrative decisions regarding disability," where a previous administrative law judge has found a claimant non-disabled, the claimant must show "'changed circumstances' in order to overcome a presumption of continuing non-disability." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (quoting Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988)).  Changed circumstances may include "[a]n increase in the severity of the claimant's impairment," a change in the claimant's age category as defined by the Grids or the existence of a new impairment.  Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995).  In addition, "a previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some res judicata consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge.  Id. (quoting Chavez, 844 F.2d at 694).

Here, the Third ALJ found that the evidence did not show a new impairment or impairments, or a worsening of impairments, in the unadjudicated period that followed the Second ALJ's decision.  (AR 11-12).  Therefore, the Third ALJ concluded that Plaintiff failed to show a "changed circumstance" capable of overcoming the presumption of continuing nondisability.  (AR 12).  The Court agrees with the Third ALJ's finding.

\\

As discussed above, Plaintiff first sought treatment from Dr. Yee in 2008, and presented with "symptoms of depression including passive suicidal ideation." (AR 482). Plaintiff also complained of difficulty with social relationships and daily activities. (Id.). On April 28, 2009, when Dr. Bedrin conducted his examination, Plaintiff described feeling depressed and claimed to see shadows and hear voices. (AR 281). On April 14, 2010, Plaintiff also told Dr. Yee that he heard voices. (AR 229). However, on May 10, 2010, Dr. Yee noted that Plaintiff was "nonpsychotic" and did not make any finding regarding hallucinations. (AR 476). Within the first year of Plaintiff's treatment, Dr. Yee prescribed Cymbalta, Remeron, and Seroquel. (AR 478). On July 30, 2010, approximately seven weeks before he testified before the Second ALJ, Plaintiff's diagnosis was unchanged and his prescriptions were the same, except for the temporary addition of Fanapt. (AR 473). Dr. Yee continued to find that Plaintiff had no mood swings, was nonpsychotic and had no suicidal or homicidal ideations. (AR 473). Dr. Yee's diagnosis remained the same on November 16, 2010, nine days after Plaintiff's most recent alleged disability onset date (AR 491), and again on November 30, 2012, six days before the most recent ALJ Hearing. (AR 545).

Therefore, the records of Plaintiff's treating and examining physicians provide no basis to conclude, as Drs. Yee and Campos did in their December 6, 2012, letter, that Plaintiff's condition had "deteriorated" over the past two years. (AR 605). To the contrary, Dr. Yee's records, beginning before the Second ALJ's

23

decision and continuing until six days before the most recent ALJ
Hearing, invariably noted Plaintiff's "stable" condition, "good"
treatment response and consistent adherence to medication.  (See
AR 487, 489-92, 545-46, 548-49, 551-56, 558-60, 561-64, 566-71,
574-80).  Moreover, although Plaintiff claimed to see shadows and
hear voices in 2012 (see, e.g., AR 601), he had described the
same symptoms in 2009.  (AR 281).  None of Plaintiff's records,
however, contains a positive diagnosis of hallucinations.

Plaintiff bears the burden of overcoming the presumption of
continuing nondisability arising from the Second ALJ's decision.
See Stubbs-Danielson, 539 F.3d at 1173 (citing Chavez, 844 F.2d
at 693).  Plaintiff's treatment records indicate no new diagnoses
and no alteration in the severity of his condition in the period
after the Second ALJ's decision.  Plaintiff alleges no other
basis for finding a changed circumstance affecting the issue of
disability.  Accordingly, the Third ALJ properly concluded that
Plaintiff has failed to rebut the presumption of continuing non-
disability.

**B.   The Third ALJ Properly Evaluated The Treating Physicians'
       Opinions And, If Any Error Occurred, It Was Harmless Error**

Plaintiff contends that, even if he failed to rebut the
presumption of continuing nondisability, the Third ALJ erred in
finding that Plaintiff's mental impairments are not severe.  (MSC
at 7-8).  Plaintiff also asserts that the Third ALJ failed to
provide specific and legitimate reasons, supported by substantial

1   evidence, for rejecting the opinions of Plaintiff's treating and

2   examining physicians, which purportedly demonstrated the severity

3   of Plaintiff's mental impairments.  (MSC 12, 15).

4

5       In assessing whether a claimant has a "severe" mental

6   impairment, the Agency considers all relevant and available

7   clinical signs and laboratory findings, the effects of the

8   symptoms, and how the claimant's functioning may be affected by,

9   _inter_ _alia_, chronic mental disorders, structured settings,

10  medication and other treatment.  20 C.F.R. § 416.920a(c).  The

11  Agency rates the degree of functional limitation in four broad

12  areas:  daily living activities; social functioning;

13  concentration, persistence, or pace; and episodes of

14  decompensation.  _Id._  If the Agency finds that the degree of

15  limitation in the first three areas is either "none" or "mild"

16  and that there are no episodes of decompensation, the impairment

17  will be non-severe, "unless the evidence otherwise indicates that

18  there is more than a minimal limitation in [the claimant's

19  ability to do basic work activities."  _Id._  "An impairment or

20  combination of impairments is not severe if it does not

21  significantly limit your physical or mental ability to do basic

22  work activities."  20 C.F.R. § 416.921.

23

24      Social Security regulations require the ALJ to consider all

25  relevant medical evidence when determining whether a claimant is

26  disabled.  20 C.F.R. §§ 404.1520(b), 416.927(c).  "Because

27  treating physicians are employed to cure and thus have a greater

28  opportunity to know and observe the patient as an individual,

25

their opinions are given greater weight than the opinions of other physicians." Smolen, 80 F.3d at 1285. "Therefore, an ALJ may not reject treating physicians' opinions unless he makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Id. (internal quotation marks and citation omitted). However, treating physicians' opinions are not accorded more weight if they are conclusory or unsupported by medical evidence. Batson v. Comm'r, 359 F.3d 1190, 1195 (9th Cir. 2004).

Furthermore, the ALJ is responsible for resolving "conflicts in medical testimony." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see also Tommasetti v Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). The ALJ need not address every piece of evidence in the record, but only evidence that is significant or probative. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2006). If the administrative process resulted in error that is merely harmless, the claimant is not entitled to a remand. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) (harmless error rule applies to review of administrative decisions regarding disability).

\\
\\
\\
\\
\\

1      **1.   The Third ALJ's Finding Regarding Plaintiff's Mental**

2         **Impairment Does Not Require Remand**

3

4      The Third ALJ found that Plaintiff had a severe impairment

5  of arthritis due to gunshot wounds.  (AR 12).  The Third ALJ also

6  acknowledged that Plaintiff had a history of mental health

7  treatment and that the Second ALJ found Plaintiff's mental

8  impairments "severe."  (Id.).  However, the Third ALJ adopted the

9  conclusions of Dr. Mohney, the consulting psychologist, and

10  determined that Plaintiff's impairments since the alleged onset

11  date were not severe.  (AR 13).  The Third ALJ found that the

12  treating and examining physicians based their assessments

13  "primarily, if not wholly, on [Plaintiff's] incredible subjective

14  complaints."  (Id.).  He also opined that Plaintiff's condition

15  had "stabilized with adherence to prescribed treatment" in the

16  period following the Second ALJ's decision.  (AR 12).

17

18      Dr. Mohney examined Plaintiff's treatment records and

19  assessed his functional limitations under listing 12.04, which

20  sets forth the criteria for affective disorders.  (AR 516, 524).

21  Dr. Mohney concluded that Plaintiff's impairments only mildly

22  restricted his daily activities, his social functioning, or his

23  ability to maintain concentration, persistence or pace.  (AR

24  524).  She also found that Plaintiff had not exhibited any

25  repeated episodes of decompensation, each of extended duration.

26  (Id.).  Accordingly, Dr. Mohney concluded that Plaintiff's

27  impairments were not severe, and did not adopt the Second ALJ's

28  residual mental capacity assessment.  (AR 526).  In reaching

these conclusions, Dr. Mohney found that Plaintiff was nonpsychotic, with no evidence of suicidal or homicidal ideation, auditory or visual hallucinations, or mood swings throughout his treatment. (Id.). Dr. Mohney noted several inconsistencies in Plaintiff's subjective claims and concluded that they were "minimally supported" by objective evidence. (Id.). For example, Dr. Mohney noted that Plaintiff claimed not to spend time with others, yet he regularly shopped and prepared meals with his landlords. (Id.).

Plaintiff relies upon a Mental Residual Capacity Questionnaire completed by Dr. Yee on April 15, 2010,[12] to support his contention that his functional limitations were "moderate" or "marked" rather than mild. (MSC at 8-10; see also AR 466-71). As additional evidence that his condition was "severe," Plaintiff cites letters from Dr. Yee and his colleagues, dated September 16 and December 23, 2010, noting that Plaintiff had been diagnosed with bipolar/schizoaffective disorder and "severe" depression. (MSC at 10; see also AR 237, 486). Plaintiff also claims that "[t]hroughout treatment, Dr. Yee had noted that [P]laintiff hears voices, music and conversations in his head" and described Plaintiff as, inter alia, scared, angry, anxious, despondent, and frustrated. (MSC at 10).

As the Third ALJ observed, however, Dr. Yee consistently noted Plaintiff's allegations of these and additional symptoms

---

[12] Plaintiff erroneously cites the date of this questionnaire as April 4, 2010. (MSC at 8).

while describing his actual condition as stable and his response to treatment and medications as favorable. (AR 12). Accordingly, the Third ALJ concluded that the letters and questionnaire, all prepared in conjunction with Plaintiff's SSI applications, were at odds with Dr. Yee's own treatment records. (AR 13). Moreover, the ALJ found that the objective evidence "suggests that [Plaintiff's] complaints of significant mental pathology are exaggerated for the purpose of security [sic] secondary gain in the form of supplemental security income." (Id.).

The Court finds that the Third ALJ's conclusion regarding Plaintiff's mental impairment has substantial support in the record. On April 14, 2010, the day before Dr. Yee completed a questionnaire showing that Plaintiff had "moderate" or "marked" impairments in several functional categories,[13] Dr. Yee assessed Plaintiff as "stable," with "no mood swings." (AR 477). Although Dr. Yee did note on this occasion that Plaintiff "hears voices," this notation disappeared from Plaintiff's treatment records by his next appointment, on May 14, 2010. (Compare AR 477 with AR 476). Plaintiff once again showed a "good" treatment response, was nonpsychotic, and had no mood swings. (AR 476).

---

[13] The Court also notes that the rating categories in the questionnaire Dr. Yee completed do not equate with the categories that the Agency uses to assess mental impairments. The questionnaire requested ratings for understanding and memory; sustained concentration and persistence; social interaction; and adaptation. (AR 469-70). In assessing the severity of an impairment, however, the Agency considers daily living activities; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c).

To the extent that Dr. Yee noted that Plaintiff was "scared," moreover, his treatment note stated that Plaintiff "is worried and scared about what will happen to him if he doesn't get SSI." (Id.). The Third ALJ noted that Plaintiff's mental condition had "stabilized" with "adherence [to] prescribed treatment." (AR 12). It was proper for the Third ALJ to discount Dr. Yee's conclusions in a functional capacity questionnaire when the objective medical evidence of record contradicted them. See Tommasetti, 533 F.3d at 1041 (incongruity between residual functional capacity questionnaire responses and objective medical evidence provides "specific and legitimate" reason to reject questionnaire); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ did not err in rejecting treating physician's statements because they were internally inconsistent and not supported by any findings made by any physician, including the treating physician).

The Third ALJ also specifically opined that Plaintiff was "extremely benefit oriented" and noted that Dr. Yee's treatment notes frequently refer to Plaintiff's attempts to secure SSI benefits. (AR 12). Accordingly, the ALJ concluded that Dr. Yee's overall assessment was based on Plaintiff's subjective complaints. (AR 13). Plaintiff's medical records support the Third ALJ's opinion. For example, on June 15, 2010, Plaintiff was "upset about the delay" in his hearing with the Second ALJ and speculated about whether "drug addicts got SSI." (AR 566). On September 16, 2010, Plaintiff told Dr. Yee that "[m]y cousin got SSI yesterday and she was faking her arthritis." (AR 562).

On December 16, 2010, after the Second ALJ's unfavorable decision, Plaintiff opined that "[m]y SSI was denied because the judge said that I didn't have schizophrenia-bipolar diagnosis in my chart," and requested such a record "in order to get his SSI approved." (AR 559). One week after terming Plaintiff's treatment response "good" in the same record (id.), Dr. Yee signed a letter incorporating this diagnosis and terming Plaintiff's prognosis "poor." (AR 237). Nevertheless, on January 11, 2011, Plaintiff's treatment response was "stable." (AR 558). In the interim, on March 9, 2011, Dr. Yee noted that Plaintiff he was able to perform community service related to an "old warrant." (AR 557-58).

It was therefore reasonable for the Third ALJ to conclude that Dr. Yee based the statements in his letters and questionnaire at least largely on Plaintiff's subjective claims, motivated by Plaintiff's efforts to secure benefits, and to reject these statements to the extent that they conflicted with the objective medical evidence. See Tommasetti, 533 F.3d at 1041 (ALJ may reject treating physician's opinion if it is based "to a large extent" on a claimant's "incredible" self-reports); Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (in assessing claimant's credibility, ALJ may consider his "well documented motivation to obtain social security benefits"). It was also reasonable for the Third ALJ to conclude that Plaintiff's mental health condition had "stabilized" with treatment, as evidence in the record supported this conclusion. (AR 12). In sum, the Third ALJ reasonably concluded that Dr. Yee's treatment records

1  did not support a finding of "severe" mental impairment, and

2  provided specific and legitimate reasons for according this

3  treating physician's opinions "little evidentiary weight." (AR

4  13).

5

6       The Third ALJ also reasonably gave less weight to the

7  opinions of state agency examining physician David Bedrin.

8  (Id.). Other than noting that Plaintiff "may have impairment in

9  his ability to perform complex tasks," Dr. Bedrin's findings were

10 mainly benign. The ALJ noted that Dr. Bedrin found Plaintiff in

11 a "fair mood," with "no evidence of thought disorder, no evidence

12 of psychomotor slowing, and only mild recent memory impairment."

13 (Id.). Accordingly, the Third ALJ found that Dr. Bedrin's

14 limitation of Plaintiff to "simple tasks" was unsupported by his

15 objective findings. (Id.).

16

17      A review of these objective findings confirms that the Third

18 ALJ's conclusion was supported by substantial evidence of record.

19 Despite Plaintiff's contention that he was "very depressed"

20 (id.), Dr. Bedrin found Plaintiff "pleasant and relaxed" and

21 neither depressed nor anxious. (AR 284). Plaintiff did not make

22 loose associations and denied having any hallucinations or

23 delusions during the examination. (Id.). Although Dr. Bedrin

24 found Plaintiff's short-term memory "mildly impaired" (AR 284),

25 he concluded that Plaintiff could "perform work activities on a

26 consistent basis." (AR 284, 286). Plaintiff's judgment and

27 insight were good and he "related well" with Dr. Bedrin. (AR

28

285).   None   of   these   conclusions   supports   a   limitation   to "simple" tasks.

Moreover, it is far from clear that Dr. Bedrin intended his specific finding -- that Plaintiff "is able to perform simple tasks" (AR 286) -- as an express limitation.   Although Dr. Bedrin found that Plaintiff "may have impairment in his ability to perform complex casks secondary to memory problems," he did not state that Plaintiff's memory issues limited his ability to complete tasks of moderate complexity.   (See AR 286).

Accordingly, the Third ALJ's conclusion that Plaintiff's mental impairment was non-severe has substantial support in the record.   When the evidence is susceptible to more than one rational interpretation, this Court "must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."   Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing Tommasetti, 533 F.3d at 1038).   Here, the ALJ's non-severe mental impairment finding was supported by reasonable inferences from the record.   However, even if this finding was error, it was harmless error, as is discussed more fully below.

> **2.   To The Extent The ALJ Erred In Assessing Plaintiff's Mental Impairments, Any Error Was Harmless**

By its own terms, the evaluation of impairments at step two is a de minimis test intended to weed out the most minor of

33

impairments.  <u>See</u> <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005) (step two is "de minimis threshold"); <u>Smolen</u>, 80 F.3d at 1290 (internal quotations and citations omitted).  This Court recognizes that a different ALJ might have found Plaintiff's mental impairments severe.  Indeed, based largely on the same evidence of record, the Second ALJ found Plaintiff's mental impairments "severe" where the Third ALJ did not.[14]  (<u>See</u> AR 79). That is a different question, however, from the ultimate determination of whether a claimant's impairments are <u>disabling</u>, and "ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination.'" <u>See</u> <u>Marsh v. Colvin</u>, ___ F.3d ___, 2015 WL 3773004, at *2 (9th Cir. June 18, 2015) (quoting <u>Stout v. Comm'r</u>, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).  Here, all three ALJs, regardless of their views on the severity of Plaintiff's mental impairments, found Plaintiff not to be disabled on the basis of his alleged mental and physical impairments.  (AR 14, 51, 86).

The court will set aside a denial of Social Security benefits "only if the denial is unsupported by substantial evidence in the administrative record or is based on legal error."  <u>Marsh</u>, 2015 WL 3773004, at *1.  Even where the ALJ reaches a nondisability finding for invalid reasons, the court will not reverse the ALJ's decision if the error was harmless. <u>See</u> <u>Carmickle</u>, 533 F.3d at 1162 (reviewing adverse credibility

---

[14] The Court notes, however, that the Second ALJ assessed only two of Plaintiff's alleged mental impairments -- polysubstance abuse and an unspecified "bipolar disorder" -- to be severe (AR 79).

34

finding for harmless error and citing Batson, 359 F.3d at 1195-97).  "[T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, . . . it is whether the ALJ's decision remains legally valid, despite such error."  Id.; see also Molina, 674 F.3d at 1111 (court "must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record") (citing Tommasetti, 533 F.3d at 1038).  Moreover, although courts apply the harmless error doctrine cautiously in Social Security cases, no "rigid rule" applies to the degree of certainty required to conclude that an ALJ's error was harmless.  Marsh, 2015 WL 3773004, at *2-*3. Although remand to the Agency is appropriate where "the circumstances of the case show a substantial likelihood of prejudice" from the error, remand for reconsideration is not appropriate where the error's harmlessness is clear.  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011).  A "[m]ere probability" of prejudice is insufficient to warrant further administrative review.  Id.

Here, although the Third ALJ found that Plaintiff had not rebutted the presumption of nondisability established by the Second ALJ's decision, he nevertheless reviewed Plaintiff's current allegations of disabling impairments, including mental impairments, in detail and at length.  (See AR 12-13).  As discussed above, in finding Plaintiff not disabled, the Third ALJ noted that Plaintiff's condition "has stabilized with adherence with prescribed treatment, including psychotropic medications." (AR 12).  The Third ALJ also found that the treating physicians'

1   functional assessments were based mainly on Plaintiff's

2   subjective allegations rather than their own objective findings,

3   which consistently showed "stable symptoms." (AR 13). Moreover,

4   the Third ALJ noted that Dr. Bedrin, the examining physician,

5   conducted mental status testing that found Plaintiff in "fair

6   mood" with "no evidence of thought disorder, no evidence of

7   psychomotor slowing, and only mild recent memory impairment."

8   (AR 13, 284). Accordingly, the Third ALJ concluded that Dr.

9   Bedrin's limitation of Plaintiff to "simple tasks" was based "not

10  on objective evidence, but on [Plaintiff's] own incredible

11  history of impairment." (AR 13). The Second ALJ reached

12  identical conclusions. (AR 82-84). As such, remand for

13  reconsideration of this issue would not alter the outcome.

14

15      The Third ALJ also posed three hypotheticals to the VE

16  during the ALJ Hearing. (AR 38). Based on the VE's testimony,

17  the Third ALJ concluded that Plaintiff was capable of performing

18  a full range of medium work. (AR 14). Although this was a more

19  expansive residual functional capacity than the Second ALJ

20  assessed (compare AR 14 with AR 85), both ALJs concluded that

21  Plaintiff was capable of performing his prior relevant work.

22  (Id.).

23

24      From this review of the Administrative Record, it is clear

25  that the Third ALJ provided specific and legitimate reasons,

26  supported by substantial evidence of record, for rejecting the

27  functional assessments of Plaintiff's treating physicians. See

28  Smolen, 80 F.3d at 1285. The Third ALJ also properly resolved

36

inconsistencies in the medical evidence, including conflicts
between the treating physician's treatment records and mental
function questionnaire and between the consulting physician's
opinion and those of the treating and examining physicians.
Andrews, 53 F.3d at 1039; Tommasetti, 533 F.3d at 1041.  The
Third ALJ's conclusion that Plaintiff's impairments were not
disabling was consistent with the conclusions of the First and
Second ALJs.  Accordingly, even if the Third ALJ erred in finding
that Plaintiff's mental impairments were not severe, this finding
was immaterial to his ultimate conclusion that Plaintiff was not
disabled and was insufficient to raise a "substantial likelihood"
of prejudice.  McLeod, 640 F.3d at 888.  The Third ALJ's decision
remains legally valid, despite any alleged error.  Accordingly,
any error was harmless, and there is no basis for reversing the
Third ALJ's decision.

**C.   The Third ALJ Had No Obligation To Further Develop The
       Record**

        Finally, Plaintiff contends that the Third ALJ failed to
fully develop the record because he did not order a new
psychiatric examination.  (MSC at 17).  Plaintiff notes that the
Agency ordered a new physical examination with Plaintiff's most
recent SSI application.  (Id.; see also AR 495-500).  Plaintiff
contends that had the Third ALJ sent Plaintiff for a fresh
psychiatric examination, "he [sic] may have come to a different
conclusion regarding Plaintiff's mental impairments . . ."  (MSC
at 18).

1    In Social Security cases the ALJ has a special duty to fully
2    and fairly develop the record and to assure that the claimant's
3    interests are considered." Smolen, 80 F.3d at 1288 (quoting
4    Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). However,
5    the Agency has "broad latitude" in ordering consulting
6    examinations and "[t]he government is not required to bear the
7    expense of an examination for every claimant." Reed v.
8    Massanari, 270 F.3d 838, 842 (9th Cir. 2001). Cases that
9    normally require such an examination include "those in which
10   additional evidence needed is not contained in the records of
11   [the claimant's] medical sources, and those involving an
12   ambiguity or insufficiency in the evidence [that] must be
13   resolved." Id. (internal quotation marks and citations omitted).
14
15   Here, no such ambiguity or insufficiency existed. The Third
16   ALJ had access to records of Plaintiff's treating physicians
17   dating back to 2008. These records unambiguously recorded
18   Plaintiff's alleged symptoms, his physicians' diagnoses and
19   Plaintiff's performance on prescribed medications. The Third ALJ
20   also reviewed and addressed Dr. Bedrin's 2009 consulting
21   examination and considered the complete review of Plaintiff's
22   treatment records by Dr. Mohney, the consulting psychologist.
23   Other than speculating that the ALJ "may have come to a different
24   conclusion" if he had sought another psychiatric examination,
25   Plaintiff does not identify any ambiguity or shortcoming in the
26   record that warranted an additional examination. Accordingly,
27   there is no basis for Plaintiff's claim that the Third ALJ was
28   obligated to require a new examination.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  July 8, 2015

_____ /S/

SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER LEGAL DATABASE.**